GISELLE J. JOFFRE (admitted pro hac vice)
gjoffre@foleyhoag.com
MICHAEL J. LICKER (admitted pro hac vice)
mlicker@foleyhoag.com
JOANNA MCDONOUGH (admitted pro hac vice)
jmcdonough@foleyhoag.com
**FOLEY HOAG LLP**
Seaport West
155 Seaport Boulevard
Boston, MA 02210-2600
Telephone:    (617) 832-1000
Facsimile:    (617) 832-7000

CAROLYN F. McNIVEN (SBN 163639)
mcnivenc@gtlaw.com
JEFFREY P. PALMER (SBN 229314)
palmerj@gtlaw.com
BRIAN Q. HALL (SBN 318209)
hallbri@gtlaw.com
**GREENBERG TRAURIG, LLP**
4 Embarcadero Center, Suite 3000
San Francisco, CA 94111
Telephone: (415) 655-1270
Facsimile: (415) 707- 2010

Attorneys for Defendants
CRESCENDO BIOSCIENCE, INC. AND
MYRIAD GENETICS, INC.

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA; STATE OF CALIFORNIA; ex rel. STF, LLC, an organization, <br><br> Plaintiffs, <br><br> v. <br><br> CRESCENDO BIOSCIENCE, INC., a Delaware corporation; and MYRIAD GENETICS, INC., a Delaware corporation, <br><br> Defendants. | Case No. 3:16-cv-02043-TSH <br><br> **DEFENDANTS' MOTION TO DISMISS** <br><br> [Fed. R. Civ. P. 9(b) and 12(b)(6)] <br><br> DATE:   May 28, 2020 <br> TIME:   10:00 a.m. <br> CTRM:  G, 15th Floor <br> JUDGE: Hon. Thomas S. Hixson |

## NOTICE OF MOTION AND MOTION

TO ALL PARTIES AND ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that the following motion will be heard on May 28, 2020, at 10 a.m. in Courtroom G on the 15th Floor of the United States Courthouse, 450 Golden Gate Avenue, San Francisco, CA  94102.

Pursuant to Federal Rules of Civil Procedure 9(b) and 12(b)(6), Defendants Crescendo Bioscience, Inc. ("Crescendo") and Myriad Genetics, Inc. ("Myriad" and together with Crescendo, "Defendants") move to dismiss the First Amended Complaint ("FAC") (Dkt. No. 9) filed by Plaintiff/Relator STF, LLC (the "Relator") under the Federal and California False Claims Acts and the California Insurance Frauds Prevention Act.

Defendants' motion to dismiss is based on this notice of motion, the accompanying memorandum of points and authorities, the proposed order, and all evidence and argument presented at the hearing on this motion.

## REQUESTED RELIEF

Defendants respectfully request that the Court grant this motion, dismiss the FAC with prejudice and enter judgment for Defendants on the FAC.

1

## TABLE OF CONTENTS

2

I. INTRODUCTION ........................................................................................................ 1

3

II. BACKGROUND ....................................................................................................... 3

4

    A.  The First Amended Complaint Contains Only Threadbare Allegations .................. 3

5

    B.  The Relator Entity Lacks Capacity to Sue and Its Complaint Contains No

6
        Insider Knowledge or Connection to Defendants ..................................................... 6

7

III. LEGAL STANDARD ............................................................................................... 7

8

IV. ARGUMENT ............................................................................................................ 8

9

    A.  The Federal and California False Claims Act Counts Must Be Dismissed for

10
        Multiple, Independent Reasons ................................................................................ 8

11

        1.     The Relator's Claims Based on Specimen Processing Agreements Fail ...... 9

12

               a)     The 2014 OIG Fraud Alert Demonstrates that Fair

13
                     Market Value Specimen Processing Arrangements do
                     not Violate the AKS .................................................................... 9

14

               b)     Even if the Relator Could Allege an AKS Violation, it

15
                     Fails to Satisfy Rule 9(b) ........................................................... 12

16

               c)     The Relator Does Not Make a Single Allegation
                     Suggesting that Defendants Knew or Had Reason to

17
                     Know That the Alleged Conduct Violated the AKS .................... 15

18

        2.     The Relator's Claims Based on Co-Pays Similarly Cannot Stand ............ 17

19

               a)     The Relator Fails to Allege an Inducement or the

20
                     Offering or Payment of Remuneration .......................................... 17

21

                b)     The Relator Fails to Provide Any of the Requisite

22
                     Detail Needed to Satisfy Rule 9(b) ................................................ 19

23

                c)     The Relator Once Again Fails to Allege Scienter ......................... 21

24

    B.  The Relator's California Insurance Frauds Prevention Act Claims Similarly
        Fail. ........................................................................................................................ 22

25

        1.     CIFPA Claims Are Subject to Rule 9(b) and the Relator's Failure to

26
               Meet This Standard Requires Dismissal ..................................................... 22

27

        2.     Whether the Knowing or Reckless Standard Applies, the Relator Failed
               to Plead Scienter .......................................................................................... 24

28

        3.     If the CIFPA Claims Survive at All, They Must Be Limited to Claims

Made to California Payors Regulated by the Department of Insurance No More Than Three Years Prior to the Filing of the Relator's Complaint..............................................................................25

C.  The Relators Improperly Lump Crescendo and Myriad Together, Without Making Any Allegations as to Myriad...................................................27

V. CONCLUSION ...........................................................................................28

Defendants' Motion to Dismiss

# **TABLE OF AUTHORITIES**

## **CASES**

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) .................................................................. 7

*Bly-Magee v. California*, 236 F.3d 1014 (9th Cir. 2001) ........................................................ 3, 12

*Colquitt v. Abbott Labs*, 858 F.3d 365 (5th Cir. 2017) ............................................................. 17

*Ebeid v. Lungwitz*, 616 F.3d 993 (9th Cir. 2010)........................................................... 3, 7, 12, 13

*Ga. ex rel. Hunter Labs., LLC v. Lab. Corp. of Am.*,
   2015 U.S. Dist. LEXIS 181893 (N.D. Ga. May 19, 2015) .......................................... 7, 20, 21

*Godecke ex rel. United States v. Kinetic Concepts, Inc.*,
   937 F.3d 1201 (9th Cir. 2019) ............................................................................................. 16

*Hanlester Network v. Shalala*, 51 F.3d 1390 (9th Cir. 1995) ...................................................... 17

*Hopper v. Anton*, 91 F.3d 1261 (9th Cir. 1996)....................................................................... 17

*Hullinger v. Anand*, 2015 U.S. Dist. LEXIS 187188 (C.D. Cal. Dec. 22, 2015) .......................... 6

*In re Int'l Rectifier Corp. Sec. Litig.*,
   2008 U.S. Dist. LEXIS 44872 (C.D. Cal. May 23, 2008) ...................................................... 22

*In re Stac. Elec. Sec. Litig.*, 89 F.3d 1399 (9th Cir. 1996)........................................................ 12

*Klaczak ex rel. United States v. Consolidated Med. Transp.*,
   458 F. Supp. 2d 622 (N.D. Ill. 2006) ................................................................................. 11

*Leysock v. Forest Labs.*, 2017 U.S. Dist. LEXIS 65048 (D. Mass. Apr. 28, 2017) ..................... 7

*Maa v. Ostroff*, 2013 U.S. Dist. LEXIS 57433 (N.D. Cal. April 19, 2013) ............................... 23

*NPT Assocs. v. Lab Corp. of Am. Holdings*,
   2015 U.S. Dist. LEXIS 155601 (S.D.N.Y. Nov. 15, 2015) .................................................. 21

*People v. Blick*, 153 Cal. App. 4th 759 (2007) ........................................................................ 25

*Shroyer v. New Cingular Wireless Services, Inc.*, 622 F.3d 1035 (9th Cir. 2010) ........................ 7

*State of California v. Encino Hospital Medical Center, et al.*, BC 641254 (Super. Ct. Cal. - Los
   Angeles June 10, 2019)......................................................................................................... 26

*The State of California, ex rel Rockville Recovery Associates, LTD v. Multiplan, Inc. et al.*, Case No. 34-2010-00079432 (Super Ct. Cal. - Sacramento Aug. 26, 2013)......................................26

*United States ex rel. Barrett v. Columbia/HCA Healthcare Corp.*,
    251 F. Supp. 2d 28 (D.D.C. 2003) .........................................................................20

*United States ex rel. Campie v. Gilead Scis.*, 862 F.3d 890 (9th Cir. 2017) ..................................8

*United States ex rel. Dooley v. Metic Transplantation Lab. Inc.*,
    2016 U.S. Dist. LEXIS 192400 (C.D. Cal. Jun.6, 2016) .........................................19

*United States ex rel. Gough v. Eastwestproto, Inc.*,
    2018 U.S. Dist. LEXIS 224953 (C.D. Cal. Oct. 24, 2018).................................8, 19

*United States ex rel. Headen v. Abundant Life Therapeutic Servs. Tex., LLC*,
    2019 U.S. Dist. LEXIS 72838 (S.D. Tex. Apr. 30, 2019) .......................................17

*United States ex rel. Hendow v. Albertson*, 461 F.3d 1166 (9th Cir. 2006) ...............................15

*United States ex rel. Hochman v. Nackman*, 145 F.3d 1069 (9th Cir. 1998)..............................15

*United States ex rel. Judd v. Quest Diagnostics, Inc.*,
    2014 U.S. Dist. LEXIS 73760 (D. N.J. May 30 2014) ............................................20

*United States ex rel. Lee v. SmithKline Beecham, Inc.*, 245 F.3d 1048 (9th Cir. 2001)...............14

*United States ex rel. Mateski v. Raytheon Co.*,
    745 Fed. Appx. 49 (9th Cir. Dec. 11, 2018) .................................................12, 14

*United States ex rel. Modglin v. DJO Global Inc.*,
    14 F. Supp. 3d 993 (C.D. Cal. 2015) ......................................................................21

*United States ex rel. Nunnally v. West Calcasieu Cameron Hospital*,
    519 Fed. Appx. 890 (5th Cir. 2013)..........................................................18, 19, 21

*United States ex rel. Pecanic v. Sumitomo Elec. Interconnect Prods.*,
    2013 U.S. Dist. LEXIS 27913 (S.D. Cal. Feb. 28, 2013) ........................................28

*United States ex rel. Riedel v. Bos. Heart Diagnostics Corp.*,
    332 F. Supp. 3d 48 (D.D.C. 2018) ..................................................7, 11, 14, 16

*United States ex rel. Silingo v. Wellpoint, Inc.*, 904 F.3d 667 (9th Cir. 2018) ......................15, 21

*United States v. Berkeley Heartlab, Inc.*, 225 F. Supp. 3d 487 (D. S.C. 2016).................7, 14, 16

*United States v. CardioDx, Inc.*,
    2019 U.S. Dist. LEXIS 83784 (N.D. Cal. May 17, 2019) ........................................14

*United States v. Chang*, 2017 U.S. Dist. LEXIS 226194 (C.D. Cal. July 25, 2017) .. 12, 18, 22, 24

*United States v. Chang*, 2018 U.S. Dist. LEXIS 227830 (C.D. Cal. Jun. 1, 2018) ...................... 17

*United States v. Legacy Heart Care, LLC*,
    2019 U.S. Dist. LEXIS 161266 (N.D. Tex. Sept. 17, 2019)...................................................... 18

*United States v. Medtronic, Inc.*,
    2017 U.S. Dist. LEXIS 153887 (S.D. Cal. Sept. 11, 2017) ........................................... 8, 9, 17

*United States v. Safran Grp., S.A.*,
    2017 U.S. Dist. LEXIS 8408 (N.D. Cal. Jan. 19, 2017) ................................................ 8, 14, 27

*United States v. Scan Health Plan*,
    2017 U.S. Dist. LEXIS 174308 (C. D. Cal. Oct. 5, 2017) ...................................................... 21

*United States v. Sci. Applications Int'l Corp.*, 626 F.3d 1257 (D.C. Cir. 2010) ......................... 22

**Statutory Authorities**

31 U.S.C. § 3729(a)(1)(A) ............................................................................................. 6, 15

31 U.S.C. § 3729(b)(1)(A) ................................................................................................. 15

42 U.S.C. § 1320a-7b(b) ...................................................................................................... 8

42 U.S.C. § 1320a-7d(b)(3)(A) ........................................................................................... 9

Cal. Gov't Code § 12651(a)(1) ............................................................................................ 6

Cal. Ins. Code § 740(g) ..................................................................................................... 25

Cal. Ins. Code § 1871.7..................................................................................... 22, 23, 24, 26, 27

**Rules and Regulations**

Fed. R. Civ. P. 12(b)(6)........................................................................................................ 7

**Legislative Materials**

S. Rep. No. 99-345(1986), reprinted in 1986 U.S.C.C.A.N. 5266 ............................................... 15

**Additional Authorities**

OIG Advisory Opinion No. 05-08 ............................................................................................ 9, 10

Special Fraud Alert: Laboratory Payments to Referring Physicians (June 25, 2014), available at https://oig.hhs.gov/fraud/docs/alertsandbulletins/2014/OIG_SFA_Laboratory_Payments_0625 2014.pdf. ............................................................................................................................ passim

*http://www.insurance.ca.gov/flipbook/healthcareproviders/4/* .................................................... 25

*https://oig.hhs.gov/compliance/physician-education/roadmap_web_version.pdf* ...................... 23

*https://www.jdsupra.com/legalnews/key-terms-for-provider-contracts-19764/* .......................... 16

**I. INTRODUCTION**

Under the cloak of a corporate entity, which presumably has no business purpose other than hunting for and prosecuting *qui tam* actions, Chris Riedel, a serial relator with no connection to either Crescendo Bioscience, Inc. ("Crescendo") or, its current parent company, Myriad Genetics, Inc. ("Myriad" and collectively with Crescendo, "Defendants"), brings this action for alleged violations of the Federal and California False Claims Acts and the California Insurance Frauds Prevention Act ("CIFPA").  Given the complete absence of any connection or relationship between Mr. Riedel and the Defendants, it is not surprising that the First Amended Complaint (the "FAC") brought by an LLC managed by Mr. Riedel, STF, LLC (the "Relator"), is built on generic, conclusory allegations and speculation, and contains none of the specific allegations required to survive a motion to dismiss.

The seven-count FAC is based on two underlying theories, both of which depend on alleged violations of the Anti-Kickback Statute (the "AKS").  First, the Relator alleges that the Defendants paid "processing" fees to physicians to induce them to refer government pay patients to take Crescendo's VectraDA blood test for rheumatoid arthritis activity in patients already diagnosed with rheumatoid arthritis.  Second, the Relator contends that Defendants promised physicians that they would cap payments for *private pay* patients in order to induce physicians to refer *government* pay business.  Neither theory is viable.  For each of these theories, the Relator's False Claims Act (the "FCA") allegations, both federal and state, must be dismissed for three independent reasons: (1) failure to allege a violation of the AKS; (2) failure to meet the rigorous Rule 9(b) pleading standard; and (3) failure to plead that either of the Defendants acted with the requisite scienter.

As a fundamental matter, neither of the Relator's two proffered theories adequately allege a violation of the AKS.  The Relator's first theory, centered on payment of "processing" fees to physicians, is not supported by any allegation that any such fee was an inducement for referrals rather than fair compensation for services provided.  The conclusory allegation that Defendants' processing fee was "well above market value" is insufficient to allege an inducement under the AKS.  The Relator's feeble attempt to offer a rationale for the alleged $15 payment being above fair market value not only lacks requisite specificity, but is also demonstrably false based on a

1    2014 OIG Special Fraud Alert.

2           The Relator's second theory, that Defendants induced government pay referrals by offering

3    to cap private pay co-pays, is even more attenuated.  The Relator fails to identify how limiting

4    private patient financial responsibility constitutes a benefit or remuneration to physicians or how

5    such physicians were "encouraged" to refer government pay patients who under the Medicare

6    program had no co-pay or deductible responsibility.  In fact, the Relator does not allege any

7    connection or causation between the alleged limiting of co-pays for *private patients* and any

8    physician's referral of *government patients* to the Defendants.  In the absence of such allegations,

9    the Relator does not offer a viable AKS theory.

10          Even if the Relator somehow satisfied the Rule 8 pleading standard, the FAC falls far short

11   of meeting the more exacting Rule 9(b) requirements.  It is black letter law that a relator must

12   plead an alleged fraudulent scheme with particularity with respect to the who, what, when, where

13   and how of the alleged conduct.  The Relator pleads no such fundamental details with respect to

14   either theory under the AKS.

15          The FAC does not name a single physician who allegedly received a "processing fee" or

16   whose patients' co-pay or deductible payments were limited, details of any agreement between

17   either of the Defendants and any physician, or the date on which any such payment or other

18   remuneration was allegedly provided.  In fact, but for a single text message and follow-up email

19   by a single sales person, the Relator fails to name individuals at either Crescendo or Myriad who

20   took part in the alleged fraud.  Moreover, with respect to the processing fee theory, the Relator

21   fails to allege any details of *how* the processing fee exceeds fair market value.  The Relator's

22   apples-to-oranges comparison of draw fees to processing fees is irrelevant.

23          Third, the Relator's attempts to allege scienter are devoid of factual support and are

24   inadequate to satisfy this "critical" element, which is an important safeguard against punishing

25   those who believe they are operating lawfully.  While Rule 9(b) does not apply to allegations of

26   scienter, the Relator still must plead sufficient factual matter from which a defendant's knowledge

27   of a fraud might be reasonably inferred.  Allegations concerning Myriad's knowledge are non-

28   existent and the few allegations concerning Crescendo's knowledge are far too conclusory to

1    satisfy this standard.

2           Finally, the Relator's CIFPA allegations must also be dismissed.  As other district courts

3    in this circuit have held, claims brought under CIFPA, which has the word "fraud" in its title, must

4    satisfy Rule 9(b) and allege scienter.  As set forth above, the Relator's generic allegations have not

5    done so.  And even if the Court determines that the CIFPA claims survive at all, they must be

6    limited to claims made by California payors regulated by the California Department of Insurance

7    within the three years prior to the filing of the Relator's original complaint.  Under California's

8    split regulatory framework, CIFPA applies only to those California insurers regulated by the

9    Department of Insurance.  The Relator's CIFPA claims must, at a minimum, be substantially

10   limited insofar as they do not account for this distinction.

11          The FCA's *qui tam* provisions are intended to incentivize corporate "insiders to disclose

12   information necessary to prevent fraud on the government."  *Ebeid v. Lungwitz*, 616 F.3d 993, 998

13   (9th Cir. 2010).  General allegations such as these, parroting those allegations raised by the same

14   professional relator in other cases against different defendants, do not further this goal.  Nor do

15   they provide Defendants with a fair chance to defend against the allegations. The purpose of the

16   FCA's stringent requirements, including compliance with Rule 9(b), is to "protect defendants from

17   the harm that comes from being subject to fraud charges, and to prohibit plaintiffs from unilaterally

18   imposing upon the court, the parties and society enormous social and economic costs absent some

19   factual basis."  *Bly-Magee v. California*, 236 F.3d 1014, 1018 (9th Cir. 2001) (quotations omitted).

20   The Relator's latest attempt to personally profit from the FCA implicates and is a clear illustration

21   of all these policy concerns.  For all of these reasons, the entire FAC should be dismissed.

22                                  **II.  BACKGROUND**

23   **A.      The First Amended Complaint Contains Only Threadbare Allegations**

24          Crescendo is a diagnostic testing company headquartered in California.  It is focused on

25   developing solutions to manage autoimmune and inflammatory diseases, specifically rheumatoid

26   arthritis.  Its product, Vectra® DA, is the first and only multi-biomarker blood test validated to

27   measure rheumatoid arthritis disease activity.  On February 4, 2014, Crescendo was acquired by

28   Myriad, a diagnostic company based in Salt Lake City.  Myriad has long been an industry leader

in diagnostic testing and is best known for its genetic tests that detect *BRCA1* or *BRCA2* gene mutations, which are responsible for the majority of hereditary breast and ovarian cancers.

On April 16, 2016, the Relator filed a complaint under seal in which it brought two causes of action against Crescendo and Myriad under the Federal and California False Claims Acts. D.N. 4. On September 6, 2017, the Relator filed the FAC, adding five causes of action under the CIFPA on behalf of the State of California. D.N. 9. On January 22, 2020, after a multi-year investigation into Crescendo and Myriad's alleged conduct, the United States declined to intervene. D.N. 23. On January 27, 2020, the State of California likewise filed its notice of declination. D.N. 24. On January 30, 2020, the Court ordered the Relator's original complaint and FAC to be unsealed. D.N. 27. Thereafter, and shortly prior to service, Defendants first learned of this lawsuit.

The FAC is long on generalities and short on specific factual allegations. It contains allegations regarding two practices that the Relator claims consist of illegal kickbacks. First, the Relator contends that "Crescendo and Myriad pay kickbacks to physicians in the form of unlawful 'processing' fees." (the "SPA Allegations"). FAC at ¶ 36. The relevant allegations are limited to the following:

- Crescendo enters into contracts with physicians whose patients may be eligible for its testing services. *Id*. at ¶ 37.
- The contracts provide for the physician, or a staff member, to draw a blood sample for testing and Crescendo provides all materials needed to pack and ship the sample. *Id*. at ¶¶ 37-38.
- Crescendo pays the physicians a $15 "processing" fee per sample. *Id*. at ¶ 40.
- Each month, Crescendo sends physicians a "Lab Test Receipt," which is "effectively an invoice." *Id*. at ¶ 41.
- Myriad sends a check to each physician. *Id*. at ¶ 43.
- Crescendo and Myriad knows these payments are "illegal," so the physician contracts go to "great lengths to describe this fee as 'fair market value' for the physician's work." *Id*. at ¶ 44.
- A $15 fee is above market value of the "time, effort or materials required for the

blood draw." *Id*. at ¶ 45.

- The venipuncture fee for Medicare is $3.  *Id*. at ¶ 48.

- The payments are "designed to induce physicians to order the VectraDA test from Crescendo and to induce the referral of patients."  *Id*. at ¶ 49.

The FAC provides no detail to support these sweeping allegations.  It does not identify a single physician or Crescendo sales representative who allegedly took part in such a transaction, let alone describe a specific transaction or alleged kickback.  Nor does it name a single specific test, a date on which such a test was administered or where it was administered, or the dollar amount of any transaction or alleged false claim submitted to the government.

Second, the Relator contends that to "induce the referral of additional business, especially government pay business, Crescendo does not charge patients any amount in excess of $25 [for its test], regardless of the patient's responsibility, and agrees not to send any patients to collections, even if the $25 is never paid," (the "Co-pay Allegations").  *Id*. at ¶ 56.  According to the Relator, by allegedly not charging *private* insurance patients more than $25, Crescendo induces physicians to send it *government pay* business.  Relator tries to connect the dots in this attenuated, speculative theory by alleging the following:

- "Regardless of the amount Crescendo bills, and regardless of the amount a patient is ultimately responsible for under their insurance plan, the patient will never be required to pay more than $25."  *Id*. at ¶ 57.

- Crescendo "knows this strategy is illegal because it provides a significant benefit to a referring physician."  *Id*. at ¶ 58.

- Crescendo informs sales personnel not to include "these facts" in emails.  A former Crescendo salesperson received an email from an unnamed person asking what the charge is for patients with PPO insurance and what the options are if they cannot pay.  The Crescendo salesperson replied by text message to the unnamed person that she could not put the out of pocket maximum in an email, but that it is $25.  The salesperson also sent the unnamed person two emails, one of which read "Glad you got my text:)."  *Id*. at ¶¶ 58-60.

- The same sales representative informed the unnamed person that Crescendo does not send patients to collections for unpaid balances. *Id*. at ¶ 61.

The FAC does not identify a single physician or Crescendo sales representative who entered an agreement to cap a patient's payment, let alone cite a specific transaction. Once again, it does not name a single specific test, a date on which such a test was administered or where it was administered, or the dollar amount of any transaction. Most critically, the FAC does not explain how the waiver or capping of *private* patients' co-pays induces physicians to send Crescendo their *government* pay patients.

With respect to the California Insurance Fraud Prevent Act claims, Relator also alleges that Crescendo and Myriad submitted claims for unnecessary tests, but does not otherwise elaborate on this theory.

Based on these allegations, the Relator brings a false presentment claim under each of the False Claims Act, *see* 31 U.S.C. § 3729(a)(1)(A), and the California False Claims Act, *see* California Government Code § 12651(a)(1), and five causes of action under CIFPA.

**B.    The Relator Entity Lacks Capacity to Sue and Its Complaint Contains No Insider Knowledge or Connection to Defendants**

The lack of detail in the FAC is not surprising. The Relator is a now-defunct entity, which does not allege a connection with the Defendants. According to the California Secretary of State's records, the Relator registered as a domestic LLC in September 2015, just a few months before filing this action. The stated purpose of the "business" is to "[d]evelop and pursue programs to reduce fraud in the medical industry and related fields." In other words, it has no legitimate business purpose and is instead designed to profit from the FCA. The LLC is in "suspended" status with the Secretary of State and has not filed an annual renewal since March 2016. The Relator's suspended status alone provides a sufficient basis for the dismissal of this case. *See Hullinger v. Anand*, 2015 U.S. Dist. LEXIS 187188 (C.D. Cal. Dec. 22, 2015) ("it is a bedrock principle of corporate law that a properly cancelled LLC lacks capacity to sue").

Given the lack of any connection with the Defendants, the FAC unsurprisingly fails to allege any basis for the Relator's knowledge of the FAC's allegations. It alleges merely that

1   "[n]on-public information personally known to Relator STF, LLC…serves as the basis for this

2   action."  FAC at ¶ 7.

3          A look behind the LLC sheds some light on the Relator's possible motivation.  The sole

4   listed manager of the Relator is Chris Riedel.  Much like the purpose of his LLC suggests, he is a

5   professional relator and is well-known for pursuing *qui tam* actions across the country.[1]  In almost

6   all of these prior cases, Mr. Riedel was a named relator. While it is unclear why Mr. Riedel opted

7   to proceed under the veil of an LLC in this action, the FAC follows a similar pattern of Mr. Riedel

8   filing a complaint without any insider knowledge or connection to the defendants.  Whatever his

9   reasons, Mr. Riedel has failed to do any diligence and has pled no specific facts to support his suit.

10  He has not even pled how he obtained the few speculative facts that are alleged in the FAC, all of

11  which raises significant questions regarding his tactics and motives.  *See Leysock v. Forest Labs.*,

12  2017 U.S. Dist. LEXIS 65048 (D. Mass. Apr. 28, 2017) (striking factual allegations that discovery

13  demonstrated were obtained by relator through improper means).

14                              **III.  LEGAL STANDARD**

15         Dismissal of a complaint pursuant to Fed. R. Civ. P. 12(b)(6) is appropriate where the

16  plaintiff fails to present a cognizable legal theory or fails to allege sufficient facts to support a

17  cognizable legal theory.  *Shroyer v. New Cingular Wireless Servs., Inc.*, 622 F.3d 1035, 1041 (9th

18  Cir. 2010).  A complaint must articulate "enough facts to state a claim to relief that is plausible on

19  its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  Although a pleading need not

20  contain detailed factual allegations, it must contain "more than labels and conclusions" or "a

21  formulaic recitation of the elements of a cause of action.  *Id.* at 555.

22         In alleging fraud or mistake, Rule 9(b) requires a party to "state with particularity the

23  circumstances constituting fraud or mistake, including the who, what, when, where, and how of

24  the misconduct charged."  *Ebeid*, 616 F.3d at 998 (quotations and brackets omitted).  The Relator

25  must additionally allege "what is false or misleading about a statement, and why it is false."  *Id.*

26

27  ─────────────
[1] *See, e.g., United States ex rel. Riedel v. Bos. Heart Diagnostics Corp.*, C.A. No. No. 12-1423 (D.D.C.); *United States v. Berkeley Heartlab, Inc.*, C.A. No. 14-cv-00230 (D.S.C.); *Ga. ex rel Hunter Labs., LLC v. Lab. Corp. of*

28  *Am.*, C.A. No. 13-cv-1838 (N.D. Ga.); *United States ex. rel. Riedel v. Atherotech, Inc.*, C.A. No. 12-cv-01422 (D.D.C.); *United States ex. rel. STF, LLC v. Vibrant America, LLC*, C.A. No. 16-2487 (N.D. Cal.).

(quotations omitted).  While a relator need not "identify representative examples of false claims to support every allegation," the Ninth Circuit has explicitly rejected relaxing the traditional who, what, when, where, and how pleading requirements.  *Id*. at 998-99.

In order to survive a motion to dismiss on claims under the Federal and California False Claims Acts, the Relator must allege facts showing "(1) a false statement or fraudulent course of conduct, (2) made with the scienter, (3) that was material, causing (4) the government to pay out money or forfeit moneys due."  *United States ex rel. Campie v. Gilead Scis.*, 862 F.3d 890, 899 (9th Cir. 2017); *see also United States v. Safran Grp., S.A.*, 2017 U.S. Dist. LEXIS 8408, at *13 (N.D. Cal. Jan. 19, 2017) ("Where, as here, the statutory provisions of the federal FCA and California FCA are the same, courts apply the same analysis to federal and California FCA claims.").

The Relator's FCA allegations, which are predicated on a supposed violation of the AKS, must adequately allege the elements of both statutes.  *United States ex rel. Gough v. Eastwestproto, Inc.*, 2018 U.S. Dist. LEXIS 224953, at *15 (C.D. Cal. Oct. 24, 2018) ("When a violation of the AKS forms the basis of an FCA claim, however, the claimant must establish a connection between the alleged kickback scheme and actual false claims submitted to the government.").  Under the AKS, the Relator must allege that Defendants provided a financial benefit to a person with the specific intent to induce purchases or reimbursements by a government health care program. *United States v. Medtronic, Inc.*, 2017 U.S. Dist. LEXIS 153887, at *31 (S.D. Cal. Sept. 11, 2017); *see also* 42 U.S.C. § 1320a-7b(b).

## IV.  ARGUMENT

### A.  The Federal and California False Claims Act Counts Must Be Dismissed for Multiple, Independent Reasons

The Relator fails to allege any viable kickback theory under the AKS because it fails to connect alleged payments to an improper inducement to a physician.  Even if the Relator's allegations were sufficient to allege an AKS theory under Rule 8, the FAC does not include a single, specific allegation of Defendants offering or paying remuneration to induce any physician. As a result, Rule 9(b) mandates dismissal for lack of particularity.  Finally, the Relator has not

1   pled a single fact from which it can be inferred that Defendants acted knowingly.  Any one of these

2   defects is fatal to the Relator's claims and they must be dismissed.

> **1.   The Relator's Claims Based on Specimen Processing Agreements Fail**
>
> **a)   The 2014 OIG Fraud Alert Demonstrates that Fair Market Value Specimen Processing Arrangements do not Violate the AKS**

6   The Relator's SPA Allegations are based on an alleged violation of the AKS, which

7   requires proof that Defendants provided a financial benefit to a person with the specific intent to

8   induce purchases or reimbursements by a government health care program.  *Medtronic, Inc.*, 2017

9   U.S. Dist. LEXIS 153887 at *31.   The Relator's claims fail at the outset because they do not

10  adequately allege a specific intent to induce referrals.

11  Most fundamentally, the Relator's SPA Allegations are based solely on the premise that

12  Defendants made payments to physicians in excess of fair market value to induce referrals of their

13  lab test.  FAC at ¶¶ 25-26, 48-49.  This argument rests on the faulty assumption that any payment

14  greater than $3 exceeds the fair market value for the services that physician offices provide to

15  Defendants.[2]  This assertion is a clumsy attempt at extrapolating from OIG Advisory Opinion No.

16  05-08, in which OIG determined that proposed $6 payments by a lab to physicians for "blood

17  specimen collection" could *potentially* generate prohibited remuneration under the AKS because

18  they exceeded the $3 reimbursement provided by Medicare for such services.  The limitation of

19  the opinion to "blood specimen collection" is a key distinction.  *See* OIG Advisory Opinion No.

20  05-08 at p. 2 ("Medicare pays $3 per patient encounter for specimen collection fees charged by

21  physicians, independent laboratories, or hospital laboratories ***for the services and supplies they***

22  ***use in collecting blood samples***…." (emphasis added)).   The FAC alleges that payments made by

23  Defendants for the "draw, processing, packaging or handling" exceed fair market value.  FAC at

---

25  [2] Defendants do not concede, and expressly dispute, that the Medicare rate of $3 for venipuncture represents fair

26  market value.  Importantly, the 2005 Advisory Opinion cannot possibly carry the weight that the Relator gives to it because the OIG is statutorily prohibited from evaluating fair market value in an advisory opinion.  *See* 42 U.S.C. §

27  1320a-7d(b)(3)(A) (advisory opinions shall not address whether "the fair market value shall be, or was paid or received for any goods, services or property").

1  ¶ 44.   However, the OIG Advisory Opinion says nothing about "processing, packaging or

2  handling."   This is not an apples-to-apples comparison, yet the Relator makes no effort to

3  distinguish, or even acknowledge, the difference.

4       A subsequent 2014 OIG Fraud Alert[3] confirms the distinction between a payment for

5  drawing a specimen, which can qualify for a $3.00 Medicare reimbursement, and a payment for

6  processing, packaging and handling the specimen, for which Medicare has no such standard

7  reimbursement rate.  Unlike the advisory opinion, the Fraud Alert "addresses arrangements under

8  which laboratories pay physicians, either directly or indirectly (such as through an arrangement

9  with a marketing or other agent) to collect, process, and package patients' blood specimens

10 (Specimen Processing Arrangements)."   A physician's duties under such arrangement may

11 include, for example, "collecting the blood specimens, centrifuging the specimens, maintaining

12 the specimens at a particular temperature[4] and packaging the specimens so that they are not

13 damaged in transport."   The Fraud Alert further confirms that the $3.00 Medicare payment

14 addressed in the 2005 advisory opinion is solely for drawing a blood sample through "venipuncture

15 (i.e., inserting into a vein a needle with syringe or vacuum tube to draw the specimen)" pursuant

16 to Medicare (CPT) Code 36415, 'Routine venipuncture – Collection of venous blood by

17 venipuncture.'"

18       The alert then confirms that Medicare reimburses physicians for processing and packaging

19 specimens through a separate payment and CPT Code.  This reimbursement "is intended to reflect

20 the work involved to prepare a specimen prior to sending it to a laboratory, including centrifuging

21 a specimen, separating serum, labeling tubes, packing the specimens for transport, filling out

22 laboratory forms, and supplying necessary insurance information and other documentation."  The

23 alert explicitly acknowledges the difference between the $3.00 Medicare payment for routine

24 venipunctures and payments for the more involved and time-consuming work of processing the

25

26  _____

    [3] Special Fraud Alert: Laboratory Payments to Referring Physicians (June 25, 2014), available at

27  https://oig.hhs.gov/fraud/docs/alertsandbulletins/2014/OIG_SFA_Laboratory_Payments_06252014.pdf ("OIG Fraud
    Alert").

28  [4] Spinning the blood samples in a centrifuge (which can take up to 30 minutes) and carefully packing them on ice are
    two important steps of the sample preparation process for a viable Vectra® test.

1  sample for testing.  OIG does not, however, suggest a rate or limitation on the fair market amount

2  of any such payments, but instead provides general guidelines for when payments for processing

3  services may constitute improper remuneration.  Moreover, the Fraud Alert and its discussion and

4  analysis of these additional payments for specimen processing would have been duplicative and

5  unnecessary if any payment over $3.00 was strictly prohibited as the Relator contends.

6          Nor is this Court bound by the U.S. District Court for the District of Columbia's decision

7  in *Riedel v. Bos. Heart Diagnostics*.  In that case, the court acknowledged that the relator's

8  allegations regarding fair market value relied on the $3 draw fee from the 2005 OIG opinion.

9  However, the court reasoned that the complaint alleged that draw fees and packaging fees, although

10 different in scope, both provide a benefit to referring physicians if above fair market value.  *See*

11 *United States ex rel. Riedel v. Bos. Heart Diagnostics Corp.*, 332 F. Supp. 3d 48, 68 (D.D.C. 2018).

12 The decision therefore stands for the proposition that any payment above market value to a

13 physician can be an inducement.  The court, however, did not grapple with the relator's failure to

14 allege any facts from which a court could infer that the packaging payments exceeded fair market

15 value.  Even accepting the court's rationale, the $3 figure is still misleading and insufficient as to

16 any allegation regarding whether Crescendo's alleged payments exceeded market value.  The

17 Relator's failure here to allege any facts demonstrating that Defendants' alleged $15 payments

18 exceeded market value is therefore dispositive.

19         Put another way, the court in *Bos. Heart* did not take into account that the *sine qua non* of

20 Mr. Riedel's inducement theory, as is the case here, was the inducement of physicians through

21 above fair market value payments.  *See Klaczak ex rel. United States v. Consol. Med. Transp.*, 458

22 F. Supp. 2d 622, 678-79 (N.D. Ill. 2006) ("In the context of the Anti-Kickback Statute, courts use

23 'fair market value' as the gauge of value when assessing the remuneration element of the

24 offense…. Relators cannot prove that the Hospital Defendants received remuneration--something

25 of value--without comparing the contracted rates with fair market value.").  The Relator may point

26 out, correctly, that *establishing* that the $15 is above market value is an issue of fact.  This point

27 is a red herring.  At the motion to dismiss stage, the relator must *allege* an improper inducement

28 under the AKS and there is no inducement if the relator fails to allege at least some facts that could

1   give rise to a reason to believe that the $15 fee is above market value.  The claims based on this

2   theory must accordingly be dismissed.

3          b)      **Even if the Relator Could Allege an AKS Violation, it Fails to Satisfy**

4                  **Rule 9(b)**

5          Claims brought by a professional relator such as STF must be viewed with even greater

6   skepticism under Rule 9(b).  That is because the False Claims Act is "geared primarily to

7   encourage insiders to disclose information necessary to prevent fraud on the government." *Ebeid*,

8   616 F.3d at 999.  Recognizing this, the Ninth Circuit has refused to lower the Rule 9(b) bar to

9   permit those with no insider knowledge, like the Relator, to assert general allegations. *Id*.  Indeed,

10  Rule 9(b) serves a critical purpose to provide defendants with enough details of the alleged fraud

11  so that they can adequately defend against the claims.  *United States v. Chang*, 2017 U.S. Dist.

12  LEXIS 226194, at *16 (C.D. Cal. July 25, 2017); *see also Bly-Magee v. California*, 236 F.3d 1014,

13  1018 (9th Cir. 2001) ("Rule 9(b) serves not only to give notice to defendants of the specific

14  fraudulent conduct against which they must defend, but also 'to deter the filing of complaints as a

15  pretext for the discovery of unknown wrongs, to protect defendants from the harm that comes from

16  being subject to fraud charges, and to prohibit plaintiffs from unilaterally imposing upon the court,

17  the parties and society enormous social and economic costs absent some factual basis.'" (quoting

18  *In re Stac. Elec. Sec. Litig.*, 89 F.3d 1399, 1405 (9th Cir. 1996)).

19         While the Ninth Circuit does not require a relator to provide representative examples of

20  submitted false claims to support each allegation, pleading the who, what, where, when and how

21  of the alleged misconduct is mandatory.  *Ebeid*, 616 F.3d at 1000 ("These general allegations--

22  lacking any details or facts setting out the 'who, what, when, where, and how' of the 'financial

23  relationship' or alleged referrals--are insufficient under Rule 9(b)."); *United States ex rel. Mateski*

24  *v. Raytheon Co.*, 745 Fed. Appx. 49, 50 (9th Cir. Dec. 11, 2018) ("without knowing which tests

25  and approximately when they were performed, Raytheon does not have enough information to

26  defend against the claims").  The Relator, managed by a professional relator hiding behind the veil

27  of an LLC, not surprisingly falls far short of meeting this standard with respect to the SPA

28  Allegations.

The FAC does not include a single allegation sufficient to meet Rule 9(b)'s requirements. In particular, the FAC does not:

- Identify a single physician who allegedly received such payments or a single employee of Defendants who made such payments (the "who");

- Allege any facts: (1) showing that any particular physicians referred any particular tests because of the receipt of any particular processing payments; (2) identifying the amount of any particular payment; (3) identifying the amount of processing fees Defendants paid with respect to any claim submitted to the government; or (4) establishing a nexus between the alleged processing fee agreements with physicians and the referral of Medicare business to Defendants (the "what");

- Provide a single date, or even date range, on which an alleged agreement was entered, an alleged payment was made or a claim was filed with the government (the "when");

- Provide any details about the alleged agreements, including who at the Defendants came to such agreements with physicians, when such agreements were reached, where or how such agreements were reached, or what the substance of the agreements was (the "how"); or

- Allege any factual basis to believe the processing fees are above market value or that the Defendants' induced any physician (the "how").

In sum, the Relator does not allege a single specific payment amount, any physician who received such a payment, a Crescendo or Myriad representative involved in making such payment, details of any agreement between either of the Defendants and any physician, or the date on which any such payment was allegedly made. Even though the Relator generally alleges the payment of processing fees, the Relator does not allege how these fees were above market value or facts demonstrating they were anything more than a legitimate payment for services rendered.

Courts in this circuit have cautioned against permitting a relator to proceed on such threadbare allegations. In *Ebeid*, for example, which involved alleged Stark Act violations, the relator alleged generally that referrals were made to the defendant by "physicians who were

employed by and whose livelihood depended on" the defendant.  *Id*. at 1000.  The relator did not

describe these referrals or any of the physicians who made them.  In the absence of these details,

the Court affirmed dismissal of the claims because a "global indictment of [defendant's] business

is not enough."  *Id*.; *United States ex rel. Lee v. SmithKline Beecham, Inc.*, 245 F.3d 1048, 1051

(9th Cir. 2001) (holding that Rule 9(b) was not satisfied, inter alia, because plaintiff did not

"identify the [defendant's] employees who performed the tests, or provide any dates, times, or

places the tests were conducted"); *see also Safran Grp.*, 2017 U.S. Dist. LEXIS 8408 (dismissing

FCA complaint where relator failed to plead who made the alleged misrepresentations, whether

they were made in a contract, separately by letter or email or in oral conversations, and alleged

generally that they were made over an eight-year period); *compare Bos. Heart Diagnostics*, 332

F. Supp. 3d at 80 (Rule 9(b) satisfied where the relator provided "the names and locations of over

fifty physicians who allegedly referred Medicare business to Boston Heart after allegedly receiving

inflated packaging fees"); *United States v. Berkeley Heartlab, Inc.*, 225 F. Supp. 3d 487, 499-500

(D. S.C. 2016) (complaint described the processing fee allegations in detail and "identifie[d] some

physicians who received P&H kickbacks"); *United States v. CardioDx, Inc.*, 2019 U.S. Dist.

LEXIS 83784 (N.D. Cal. May 17, 2019) (denying motion to dismiss where relator alleged that

defendant phlebotomist staffing agency conspired with lab to hire medical providers as staffing

agency's "independent contractors" and paid the "independent contractors" $19 out of a $25

specimen processing fee from the lab to induce referrals).

　　　　The Ninth Circuit's decision in *Mateski* highlights the absence of the requisite detail in the

FAC.  There, the relator alleged that Raytheon "'failed to perform complete tests and retests of

component parts and of assembled hardware in violation of' two contractual requirements."

*Mateski*, 745 Fed. Appx at 50.  This caused the Court to question "Which tests? Which component

parts? Were no tests done, or were they done incompletely? The allegations cover the period 2002

to 2010; without knowing which tests and approximately when they were performed, Raytheon

does not have enough information to defend against the claims."  *Id*.  The same holds true here:

Who were the physicians? How much were the alleged payments? Which VectraDA tests did the

payments apply to? What was the nature of the agreements? How did the payments exceed fair

market value?  The list goes on.  The FAC's failure to answer any one of these questions requires dismissal.

<b>c)      The Relator Does Not Make a Single Allegation Suggesting that Defendants Knew or Had Reason to Know That the Alleged Conduct Violated the AKS</b>

The Relator's effort to allege scienter, a requirement which is "critical to the operation of the False Claims Act," similarly misses the mark.  *United States ex rel. Hochman v. Nackman*, 145 F.3d 1069, 1073 (9th Cir. 1998).  "Congress specifically amended the False Claims Act to include this definition of scienter, to make 'firm . . . its intention that the act not punish honest mistakes or incorrect claims submitted through mere negligence.'"  *Id*. (quoting S. Rep. No. 99-345, at 7 (1986), reprinted in 1986 U.S.C.C.A.N. 5266, 5272).

As a result, a defendant can be held liable under the False Claims Act only when it "knowingly" presents a false claim for payment.  31 U.S.C. § 3729(a)(1)(A).  The False Claims Act defines "knowingly" as having: (1) actual knowledge of the information; (2) deliberate ignorance of the truth or falsity of the information; or (3) reckless disregard of the truth or falsity of the information. 31 U.S.C. § 3729(b)(1)(A).  Based on this definition, the Ninth Circuit has "made clear that a palpably false statement, known to be a lie when it is made, is required for a party to be found liable under the False Claims Act."  *United States ex rel. Hendow v. Albertson*, 461 F.3d 1166, 1172 (9th Cir. 2006).  While allegations of scienter need not satisfy Rule 9(b), the Relator still must set forth "sufficient factual matter from which a defendant's knowledge of a fraud might reasonably be inferred."  *United States ex rel. Silingo v. Wellpoint, Inc.*, 904 F.3d 667, 679-80 (9th Cir. 2018).  It has not done so.

The only allegation in the FAC that even touches on either of the Defendants' knowledge is found in paragraph 44 and reads as follows: "Because Crescendo and Myriad know that such payments are illegal, the contract goes to great lengths to describe this fee as 'fair market value' for the physician's work."  Instead of establishing the Defendants "knowingly" submitted false claims, this allegation shows Defendants' diligence and good faith belief that payments made to

doctors were paid at fair market value.[5]   There is no basis to infer Defendants' knowledge of any wrongdoing from this single allegation and courts in this circuit have required significantly more. *See, e.g.*, *Godecke ex rel. United States v. Kinetic Concepts, Inc.*, 937 F.3d 1201, 1212 (9th Cir. 2019) (allegations of scienter sufficient where relator alleged that (1) management knew Medicare would not pay for devices where defendant had not received a written order form from physician; (2) defendant setup "tracking systems" to "mask" that not all requirements were satisfied; and (3) another employee had told the relator that defendant did not appeal Medicare denials because it would draw unnecessary attention to the problem).

        As with the Relator's attempts to satisfy Rule 9(b), the allegations of Defendants' knowledge are also readily distinguishable from the past cases brought by Mr. Riedel regarding specimen processing agreements.   In those cases, Mr. Riedel's allegations demonstrated knowledge of the arrangements by high-level corporate officials through, among other things, efforts taken to avoid detection of the payments.   In *Bos. Heart*, for example, the court relied extensively on detailed allegations of the defendant's alleged actions to conceal the processing payments following the issuance of the Fraud Alert.  332 F. Supp. 3d at 73-74.  Specifically, the court pointed to allegations that the defendant began paying physicians' offices through specifically named third parties, rather than directly.  *Id*. at 73.  Mr. Riedel indeed alleged that the defendant told a physician that "[the Department of Justice] said we can't pay you [the physician] directly, so we pay [a third party], they take some of the money and they pay you. It's all about perception."  *Id*.  Mr. Riedel moreover alleged that the defendant's CEO and two members of its board were involved in the decision to pay fees and "promote[d] this practice by sponsoring seminars that discuss[ed] how profitable splitting up tests between laboratories can be for physicians."  *Id*. at 74; *see also Berkeley Heartlab*, 225 F. Supp. at 500 (complaint alleged that

---

[5] Such a provision is considered a "best practice" in entering an arrangement with a potential referral source.  *See, e.g.*,  https://www.jdsupra.com/legalnews/key-terms-for-provider-contracts-19764/  (last accessed  April 8, 2020) ("**Regulatory Compliance**. It is typically a good idea to include a broad provision confirming that the parties intend the agreement to comply with relevant regulations; the contract will be interpreted so as to ensure compliance; and either party may terminate upon notice if one party determines the contract may expose it to governmental action and the parties are unable to amend the agreement to ensure compliance.").

1    defendants tried to disguise processing and handling fees and received emails from physician

2    practices and their attorneys asserting that the processing and handling fees were kickbacks).  The

3    Relator does not even come close to reaching this threshold here.[6]

4            2.      **The Relator's Claims Based on Co-Pays Similarly Cannot Stand**

5            The Relator's second theory of False Claims Act liability, that Defendants somehow

6    induced referrals of patients with government insurance by capping the payments of private pay

7    patients, fares no better.  Its allegations of inducement are speculative and do not meet the Rule 8

8    threshold, and even if they did, the Relator once again fails to allege any of the requisite detail

9    necessary to satisfy Rule 9(b).  Finally, its scienter allegations are based on a single text message

10   exchange between a low-level employee and an unnamed third party and do not provide a

11   sufficient factual basis from which either Defendants' knowledge can be inferred.

12           a)      **The Relator Fails to Allege an Inducement or the Offering or Payment**
13                   **of Remuneration**

14           The Relator's Co-pay Allegations are missing at least two essential elements.  First, FCA

15   allegations brought under the AKS require a "link" between "the supposed inducements" and false

16   claims for payment.  *See Medtronic, Inc.*, 2017 U.S. Dist. LEXIS 153887 at *33; *United States v.*

17   *Chang*, 2018 U.S. Dist. LEXIS 227830 at *13 (C.D. Cal. Jun. 1, 2018) citing *Hanlester Network*

18   *v. Shalala*, 51 F.3d 1390, 1398 (9th Cir. 1995) (defining inducement as exercising "influence over

19   the reason or judgment of another in an effort to cause the referral of business."); *United States ex*

20   *rel Colquitt v. Abbott Labs*, 858 F.3d 365, 372 (5th Cir. 2017) ("In short, the complaint never links

21   the alleged carrots to the purchase and use of the stents at either of the hospitals."); *United States*

22   *ex rel. Headen v. Abundant Life Therapeutic Servs. Tex., LLC*, 2019 U.S. Dist. LEXIS 72838 at

23   *17-18 (S.D. Tex. Apr. 30, 2019) ("To allege 'particular details of [the] scheme,' [relator] must

24

25   [6] The Relator references the Fraud Alert in the FAC, but does not allege that Defendants had knowledge of it or that
     any such knowledge would be sufficient to provide Defendants with the requisite level of scienter.  Even if the Relator
26   had made such an allegation, it would not be viable.  Good faith, and even negligent, attempts to comply with a
     regulation, let alone agency guidance, are insufficient to satisfy the rigorous scienter requirement.  *See Hopper v.*
27   *Anton*, 91 F.3d 1261, 1266 (9th Cir. 1996) ("Violations of laws, rules or regulations alone do not create a cause of
     action under the FCA.").  And even if OIG's publication of the Fraud Alert standing alone was somehow sufficient to
28   demonstrate that Defendants' had the requisite knowledge, the Relator's FCA claims would have to be dismissed to
     the extent they arose prior to June 25, 2014.

1   assert facts linking the kickbacks to the inducement of referrals.").   In other words, a causal

2   connection is required.   *United States ex rel. Nunnally v. West Calcasieu Cameron Hospital*, 519

3   Fed. Appx. 890, 894 (5th Cir. 2013) ("[Relator] must provide reliable indicia that there was a

4   kickback provided in turn for the referral of patients."); *United States v. Legacy Heart Care, LLC*,

5   2019 U.S. Dist. LEXIS 161266 (N.D. Tex. Sept. 17, 2019) (relator did not plead sufficient facts to

6   show that the co-pay waivers induced patients to obtain treatment from defendants).

7        Here, the Relator's complaint is barren.  It does not allege any facts supporting a connection

8   between the alleged fraudulent practice and the inducement.  Instead, the Relator only pleads that

9   "[i]n order to induce the referral of additional business, especially government pay business,

10  CRESCENDO does not charge patients any amount in excess of $25, regardless of the amount of

11  the patient's responsibility, and agrees not to send any patients to collections, even if the $25 is

12  never paid.  CRESCENDO tells doctors this so that they can reassure their patients that they will

13  not be responsible for more than $25, regardless of the amount they owe.  These caps are of value

14  to both physicians and their patients."  FAC at ¶ 56.

15       The Relator puts forth a vague cause and effect theory without alleging any connection

16  between the two.  Indeed, missing from this hypothesis is any factual allegation tying Crescendo's

17  alleged decision to cap the co-pay for its test at $25 for privately insured patients or not to send

18  patients to collections to any agreement with any physician, let alone any physician sending it

19  government pay business.  The Relator presupposes a link between this alleged cap for private pay

20  patients and the referral of government pay business, and in doing so, asks the Court to fill the gap.

21  One conclusory allegation of inducement does not satisfy the basic pleading requirements for

22  Relator's claim.

23       Second, the FAC does not address how any physician benefited from the alleged capping

24  of private pay co-pays.   The bald allegation that Defendants informed potential referring

25  physicians that co-payments would be waived does not amount to a remuneration to induce

26  referrals. *Chang*, 2017 U.S. Dist. LEXIS 226194 at *21. This is because supposed waiver would

27  have to be offered to the *patients* and provides nothing of value to the referring *physicians*.  *Id*. at

28  *21-22. Thus, to sufficiently plead a co-payment waiver claim, Relators must also allege the

1  referring physicians' receipt of payment or other remuneration in exchange for referrals.  *Id.* at

2  *22 (dismissing claim based on co-pay waiver theory because relators did not sufficiently allege

3  the referring physician's receipt of payment or other remuneration in exchange for referrals).

4              **b)**       **The Relator Fails to Provide Any of the Requisite Detail Needed to**

5                          **Satisfy Rule 9(b)**

6          Even if Relator successfully pled the elements of its claim, the pleading is insufficient

7  under the heightened Rule 9(b) standard for many of the same reasons that the Relator's SPA

8  Allegations are deficient.  Once again, the Relator does not identify a single physician who

9  allegedly benefited from the capping of a private pay co-pay or the remuneration or benefit that

10  any physician received. The FAC is devoid of any details of any agreement requiring Defendants

11  to limit co-pays or not pursue patient collections in exchange for referrals.  The Fifth Circuit's

12  decision in *Nunnally*, in which the relator alleged that a hospital charged reduced test fees to

13  physicians in return for the physician referring all patients in need of laboratory tests, is instructive.

14  The court rejected the relator's AKS allegations, finding:

15              We are given no information on the contents of those agreements, the identity of

16              any physicians, actual inducements, or improper referrals. The sole 'specificity' in
            the complaint is an 'example' of an agreement to charge physicians $3.60 for a

17              blood test, while later charging Medicare $10.60 for the same test. This 'example'
            is insufficient because it does not allege, nor reliably indicate, that the two

18              differing pay scales constitute 'remuneration' to the physicians. It does not even
            indicate that these amounts are real rather than hypothetical. The complaint does

19              not specify who in particular was involved in this 'agreement,' or how it
            constituted an illegal kickback.

20

21  *Id.* at 894.  Here, the Relator does not provide any of the information necessary to satisfy Rule

22  9(b), let alone provide an example of an alleged kickback.  *United States ex rel. Dooley v. Metic*

23  *Transplantation Lab. Inc.,* 2016 U.S. Dist. LEXIS 192400 at *10 (C.D. Cal. Jun. 6, 2016)

24  ("Although the SAC includes additional information tending to corroborate Relators' general

25  allegation that kickbacks were paid, it still fails to identify any specific individuals who accepted

26  a kickback or any specific occurrence of a kickback actually being paid."); *United States ex rel.*

27  *Gough v. Eastwestproto, Inc.,* 2018 U.S. Dist. LEXIS 224953 at *24 (C.D. Cal. Oct. 24, 2018)

28  ("The FAC does not connect 'off-campus' transports actually provided, if any, to Medicare

1 services, or otherwise present any facts to indicate the submission of a false claim."); *United States*

2 *ex rel. Barrett v. Columbia/HCA Healthcare Corp.*, 251 F. Supp. 2d 28, 35 (D.D.C. 2003)

3 ("Relators do not allege that claims for payment were made to the federal government for patients

4 for whom the co-pay was waived. A viable complaint must contain such an allegation.").

5       The Relator's only attempt at any level of specificity is to identify a text message and email

6 exchange between a "former sales person" at Crescendo and an unknown third party, in which the

7 sales person allegedly stated in text message that she could not provide the out-of-pocket

8 maximum for Crescendo's test via email, but that it was $25.  *See* FAC at ¶¶ 58-60.  This single

9 exchange also misses the mark.  It does not identify the recipient of the message and email, whether

10 the recipient ordered a single VectraDA test, much less a government pay test, or what alleged

11 benefit the recipient received.

12       Moreover, the type of "pull through" allegations made by the Relator here, where a relator

13 alleges that a defendant violated the FCA by waiving co-payments for privately insured patients

14 in order to pull through government business, add an additional requirement: the relator must show

15 a nexus between the kickbacks for private insurance and the Medicare or Medicaid business.  *See*

16 *United States ex rel. Judd v. Quest Diagnostics, Inc.*, 2014 U.S. Dist. LEXIS 73760, at *48 (D.

17 N.J. May 30 2014) ("[Relator] must allege this causal link in accordance with Rule 9(b)")*; see also*

18 *Ga. ex rel. Hunter Labs., LLC v. Lab. Corp. of Am.*, 2015 U.S. Dist. LEXIS 181893, at *11 (N.D.

19 Ga. May 19, 2015).

20       Notably, in *Hunter Labs*, Mr. Riedel made almost identical allegations and, as is

21 appropriate here, the court dismissed them with prejudice.  He "allege[d] that defendants provided

22 kickbacks in the form of deeply discounted private rates to draw in large volumes of 'pull through'

23 Medicaid and other referrals."  2015 U.S. Dist. LEXIS 181893 at *4.  As with the allegations in

24 the present complaint, the court agreed with the defendants' argument that Mr. Riedel's complaint

25 "'does not identify with particularity any improper discount, any improper inducement, any

26 referral source, any improper referral from such source—and ... no [government insurance] claim

27 from such a referral.'"  *Id*. at *10.  Mr. Riedel thus "failed to allege with particularity by identifying

28 an improper/illegal referral or Medicaid claim from such referral." *Id*. at *11; *see also United*

*States ex rel NPT Assocs. v. Lab Corp. of Am. Holdings*, 2015 U.S. Dist. LEXIS 155601, at \*14-15 (S.D.N.Y. Nov. 15, 2015) (dismissing "pull through" claim where relator "alleges virtually no details as to the parameters, timing, or parties to the [alleged fraudulent] agreements").  As in *Hunter Labs*, the Relator's "sweeping and conclusory" allegations fail to offer a "shred of detail or particularity" and must be dismissed.  *Nunnally,* 519 Fed. Appx. at 894.

### c) The Relator Once Again Fails to Allege Scienter

The FAC should also be dismissed because, as with the SPA allegations, it falls far short of setting forth "sufficient factual matter from which a defendant's knowledge of a fraud might reasonably be inferred."  *Silingo*, 904 F.3d at 679-680.  The sum total of the Relator's effort to plead scienter is that "CRESCENDO knows this strategy is illegal because it provides a significant benefit to a referring physician."  FAC at ¶ 58.  This conclusory statement provides no factual basis on which a court could infer Crescendo's knowledge, and certainly does not provide a basis to establish Myriad's knowledge.  *See United States ex rel. Modglin v. DJO Global Inc.*, 114 F. Supp. 3d 993, 1024 (C.D. Cal. 2015) ("In the absence of any factual allegations supporting relators' assertion that defendants acted with the requisite scienter, their allegations that defendants 'knew that they were falsely and/or fraudulently claiming reimbursement' and 'knew [their devices] were being unlawfully sold for unapproved off-label cervical use' are too conclusory to plead a plausible claim for relief, even under the relaxed standard of Rule 8(a).").

In the absence of any facts demonstrating Crescendo's knowledge that the alleged capping of co-pays violates the AKS, the Relator is left with the same conversation addressed above between a "former sales person" at Crescendo and an unnamed third party.  Based on this single conversation, the Relator contends that Crescendo "informed its sales personnel not to including [sic] in email these facts," allegedly in an "effort to conceal their scheme and avoid liability."  FAC at ¶¶ 58-61.  One text message by a single sales employee does not support an allegation or inference of a company-wide policy or practice and is insufficient to tag a corporate entity with knowledge or endorsement of an alleged fraudulent cover-up.  *See United States v. Scan Health Plan*, 2017 U.S. Dist. LEXIS 174308, at \*15 (C. D. Cal. Oct. 5, 2017) ("Generally, 'for scienter to be attributed to a corporation, Plaintiffs must sufficiently plead that at least one of the

1    corporation's officers had the requisite scienter at the time they made the allegedly misleading

2    statements.'" (quoting *In re Int'l Rectifier Corp. Sec. Litig.*, 2008 U.S. Dist. LEXIS 44872 at *21

3    (C.D. Cal. May 23, 2008) (brackets omitted)); *see also United States v. Sci. Applications Int'l*

4    *Corp.*, 626 F.3d 1257, 1275 (D.C. Cir. 2010) (rejecting "collective knowledge theory" and

5    distinguishing "between the knowledge of corporate officers and that of potentially thousands of

6    ordinary employees").  The FAC must be dismissed as a result.

7    **B.    The Relator's California Insurance Frauds Prevention Act Claims Similarly Fail.**

8          The FAC also alleges five causes of action under the CIFPA. This includes one cause of

9    action under § 1871.7(a) of the California Insurance Code and four causes of action claims under

10   § 1871.7(b).  Section 1871.7(a) makes it unlawful to knowingly employ "runners, cappers, steerers,

11   or other person to procure…patients to perform or obtain services or benefits…under a contract of

12   insurance."  Section 1871.7(b) imposes civil penalties for violations of certain provisions of the

13   California Penal Code ("PC").  Relator alleges violations of PC §§ 549, 550(a)(1), 550(a)(5), and

14   550(a)(6) pursuant to CIFPA § 1871.7(b).  Each of the claims must be dismissed, or, in the

15   alternative, considerably narrowed, for the reasons stated below.

16        **1.    CIFPA Claims Are Subject to Rule 9(b) and the Relator's Failure to Meet This
17              Standard Requires Dismissal**

18         CIFPA claims involve allegations of fraud and therefore must be plead with particularity

19   pursuant to Rule 9(b).  *See Chang*, 2017 U.S. Dist. LEXIS 226194 at *44 (granting motion to

20   dismiss CIFPA claims for failing to meet the heighted Rule 9(b) pleading standard).  As with the

21   Relator's claims under the FCA, all of the Relator's CIFPA claims are insufficient to meet the

22   heightened Rule 9(b) pleading standard.

23         Relator broadly alleges that "Crescendo's $15 draw fees, its capping and waiving of co-

24   pays and deductibles, and its refusal to send patients to collections for failure to pay the $25

25   deductible or co-payment" are fraudulent kickback schemes[7] that violate § 1871.7(a) because

26   _____

27   [7] Relator assumes without any support that anything short of sending a patient to collections constitutes fraudulent
28   waiver.  The opposite is true, with OIG itself stating that all that is required is a "reasonable collection effort".  *See,*

these acts "cause Crescendo's sales representatives to act as 'runners, cappers, steerers, or other person' to procure physicians…who in turn perform tests 'that will be a basis of a claim against an insured individual or his or her insurer.'"  FAC at ¶ 65.

Relator's claims under § 1871.7(b) are astonishingly even more general.  With respect to Defendants' alleged violation of PC §550, Relator asserts that Defendants submitted false and fraudulent claims for reimbursement of tests because (1) the tests were medically unnecessary and unreasonable; and (2) the tests were procured by means of, or otherwise involve, the payment of illegal kickbacks. FAC at ¶¶ 88, 93, 98. With respect to PC § 549, Relator simply alleges that Defendants "solicited, accepted, or referred business to or from laboratories, physicians, and physician office staff that intended to violate Section 550 of the Penal Code…." FAC at ¶¶ 102, 103.

Relator's general theories of Defendants' alleged wrongdoing are insufficient to satisfy Rule 9(b). In addition to the defects described in the above sections, with respect to the CIFPA claims specifically, the FAC fails to:

- Identify any private insurers that were allegedly defrauded as a result of Defendants' actions;

- Provide any details evidencing that Defendants engaged in a plausible scheme to defraud private insurers;

- Identify either specific instances or a time range in which Defendants improperly waived a private insurer's patient's co-payment or deductible or submitted false claims to a private insurer;

- Allege any facts that Defendants were not permitted to waive deductibles and co-payments for financial hardship or other circumstances;

- Identify any claims submitted to private insurers that were medically unnecessary or unreasonable.  *See, e.g.*, *Maa v. Ostroff*, 2013 U.S. Dist. LEXIS 57433, at *61-

---

*e.g.*, https://oig.hhs.gov/compliance/physician-education/roadmap_web_version.pdf ("However, you are free to waive a copayment if you make an individual determination that the patient cannot afford to pay or if your reasonable collection efforts fail.").

62 (N.D. Cal. April 19, 2013) (dismissing CIFPA claim for failing to allege unnecessary procedures with any particularity and failing to identify any statute that requires claims submitted to private insurers to be medically necessary); or

- Allege how any of the VectraDA tests, which have the very specific purpose of measuring rheumatoid arthritis in patients already diagnosed, were unnecessary.

The district court's ruling in *Chang* is instructive. In that case, Relator asserted a CIFPA claim based on Defendants' alleged practice of routinely waiving co-payments and deductibles for patients covered by commercial health plans in violation of PC § 550.  2017 U.S. Dist. LEXIS 226194 at *44.  While the relator identified ten Medicare patients whose co-payments were not collected and whose medical records did not support such waivers, no analogous facts were alleged with respect to patients with private insurance. The court found Relator's complaint "bereft of certain essential facts required to satisfy Rule 9(b)" and dismissed Relator's CIFPA claim on that basis.  *See also United States ex rel. Karp v. Solheim*, 2018 U.S. Dist. LEXIS 228137, CV 16-500-PSG (JPRx) at *7 (C.D. Cal. May 28, 2018) (stating that Relator's allegations that Defendants submitted dozens of claims to a private insurer for appointments that never took place and invented diagnoses, drug prescriptions and other pretexts for upcoding bills submitted to private insurers created a "plausible inference that Defendants engaged in a scheme to defraud private insurers, but they do not include *particular details* relating to false claims allegedly made to the government. As such, the Court cannot 'infer[] that claims were actually submitted.'").

## 2. Whether the Knowing or Reckless Standard Applies, the Relator Failed to Plead Scienter

The plain language of the CIFPA requires a defendant to have acted knowingly or recklessly with respect to its alleged conduct.  Section 1871.7(a) of the CIFPA makes it unlawful to "***knowingly*** employ runners, cappers, steerers, or other person to procure…patients to perform or obtain services or benefits…under a contract of insurance." (Emphasis added).  Similarly, claims brought under 1871.7(b) for violations of PC §§ 550 and 549 require the defendant to have

acted "knowingly" or "recklessly," respectively.[8]   Under PC § 550, "knowingly" has been interpreted to require a "specific intent to defraud."  *See People v. Blick*, 153 Cal. App. 4th 759, 774 (2007) ("specific intent to defraud" is an element of "all section 550, subdivision (a) offenses").

Regardless of which standard applies, the Relator's CIFPA claims must be dismissed because they fail to make *any* allegation regarding Defendants' knowledge or recklessness as to their alleged conduct.  *See infra,* section A(1)(c).

### 3.    If the CIFPA Claims Survive at All, They Must Be Limited to Claims Made to California Payors Regulated by the Department of Insurance No More Than Three Years Prior to the Filing of the Relator's Complaint

Health insurance in California is regulated by two different agencies: The California Department of Insurance ("CDI") and the California Department of Managed Health Care ("CDMHC").   CDI regulates "point-of-service health plan and certain Preferred Provider Organization (PPO) health plans underwritten by health insurance companies licensed by the CDI."[9]   However, the CDI does not regulate "health care service plans" including Health Maintenance Organizations (HMOs) or certain PPOs including Blue Cross of California or Blue Shield of California.  Those entities are exclusively regulated by the CDMHC.[10]  This distinction is important because the CIFPA is a creature of the California Insurance Code, to which health care service plans are not subject.  *See Cal. Ins. Code* § 740(g)("[a] health care service plan…shall

---

[8] PC § 550(a) states, in relevant part, that "[i]t is unlawful to…(1) *knowingly*  present or cause to be presented any false or fraudulent claim for the payment of a loss or injury, including payment of a loss or injury under a contract on insurance…(5) *knowingly* prepare, make, or subscribe any writing, with the intent to present or use it, or to allow it to be presented, in support of any false or fraudulent claim…(6) *knowingly* make or cause to be made any false or fraudulent claim for payment of a health care benefit." (Emphasis added).

PC § 549 states, "[a]ny firm, corporation, partnership, or association, or any person acting in his or her individual capacity, or in his or her capacity as a public or private employee, who solicits, accepts, or refers any business to or from any individual or entity *with the knowledge that, or with the reckless disregard for whether*, the individual or entity for or from home the solicitation or referral is made, or the individual or entity who is solicited or referred, intends to violate Section 550 of this code…is guilty of a crime…." (Emphasis added).

[9] http://www.insurance.ca.gov/flipbook/healthcareproviders/4/ (last accessed 3/30/2020).

[10] *Id.*

---

1    not be subject to this section.") (defining the scope of the CDI's jurisdiction over health plans).

2    Indeed, the CIFPA itself makes clear that its provisions apply to claims submitted pursuant to "a

3    contract of insurance." §1871.7(a-b).[11]

4        At least two courts in California have held that claims submitted to health care service

5    plans subject to CDMHC regulation are exempt from CIFPA claims.  In *The State of California,*

6    *ex rel Rockville Recovery Associates, LTD v. Multiplan, Inc. et al.*, Case No. 34-2010-00079432

7    (Super Ct. Cal. - Sacramento August 26, 2013), the court entered an order limiting Plaintiff's

8    CIFPA case to claims submitted to an "insurance company" pursuant to "contracts of insurance"

9    (in contrast to claims submitted to health care service plans or self-funded ERISA plans).  In a

10   robust analysis that continued for three pages, the court rejected Plaintiff's argument that the terms

11   "insurance company" and "contract of insurance" employed in §1871.7 of the Insurance Code

12   should be interpreted broadly as a "catch-all for all entties that engage in business that may have

13   characteristics or indicia of insurance." Employing standards of statutory construction, the court

14   was persuaded that the terms "insurance company" and "contract of insurance" in the statute were

15   used by the legislature to "expressly specify insurance companies and contracts under the

16   jurisdiction of the Commissioner and [CDI], and conversely to distingush same from health care

17   service plans and health maintenance organizations, and membership contacts."

18       More recently, in *State of California v. Encino Hospital Medical Center, et al.*, BC 641254

19   (Super. Ct. Cal. - Los Angeles June 10, 2019), the court granted summary judgment in favor of

20   Defendants limiting Plaintiffs' case to "claims presented to an insurance company" to the

21   exclusion of health care service plans, HMOs, and ERISA plans. The court also agreed with

22   Defendants that the CIFPA limited the jurisdiction of the commissioner to claims submitted to

23   *California* insurance companies.[12]

24

25   _____

     [11] Significantly, the commissioner of the CDI, the attorney general, and "interested persons" (i.e. whistleblowers) are
26   empowered to bring a civil action for violations of the CIFPA. §1871.7(e-f). The CDMHC does not even have to be
     notified of such actions.

27   [12] Section 41 of the California Insurance Code states, "***All insurance in this State*** is governed by the provisions of
     this code." (emphasis added). The California Insurance Code makes no provision for the regulation of insurance
28   ***outside*** of California.

1    Unsurprisingly, the Relator's FAC, which is hardly a model of specificity, fails to confine

2  any of the five CIFPA claims to these appropriate bounds.  Defendants must assume that the

3  Relator seeks damages for claims submitted to California health care payors falling outside of the

4  CDI's regulatory authority and those submitted to out of state insurers.  This assumption is

5  reinforced by the Relator's references to "managed care companies" such as Blue Cross/Blue

6  Shield of California, United Healthcare, Aetna, and Cigna as well as various government payors

7  in the CIFPA section of the FAC.  *See* FAC at ¶¶ 66, 83.  For the reasons stated above, the Relator's

8  CIFPA claims must be dismissed to the extent they are designed to seek penalties for claims falling

9  outside the regulatory or geographical jurisdiction of the CDI.[13]

10  **C.    The Relators Improperly Lump Crescendo and Myriad Together, Without Making**
        **Any Allegations as to Myriad**
11

12    As demonstrated above, the Relator's entire speculative complaint should be dismissed.

13  But at a minimum, the FAC should not survive as to Myriad, which the Relator does not allege

14  engaged in any particularized wrongdoing.  The FCA requires that a complaint provide an adequate

15  factual basis connecting that claim to the particular defendant, and, in particular, Rule 9(b)

16  "requires plaintiffs to differentiate their allegations when suing more than one defendant."  *Safran*

17  *Grp.*, 2017 U.S. Dist. LEXIS 8408 at *21-22.  With respect to the SPA Allegations, the only

18  allegation as to Myriad is that "it sends a check to the physician, pursuant to CRESCENDO's

19  contract to pay the physician.  Each check is sent to the physician with an 'Invoice Number' from

20  MYRIAD, a date, and a 'description' that notes the month the payment covers."  FAC at ¶ 43.

21  However, this allegation is far too general to demonstrate Myriad paid any kickbacks, let alone

22  satisfy Rule 9(b).  With respect to the Co-pay Allegations, the Relator does not even mention

23  Myriad.  Allegations that Myriad acted with the necessary scienter are likewise non-existent with

24  respect to both theories.

25    Absent any factual allegations as to Myriad, the Relator turns to Myriad's 2014 purchase

26

27  [13] Additionally, the FAC does not contain any temporal limits with respect to the CIFPA claims.  The CIFPA
    requires that civil actions be brought within "three years after the discovery of the facts constituting the grounds for
    commencing the action." Cal. Ins. Code § 1871.7.  To the extent the Relator's CIFPA claims are based on facts prior
28  to September 6, 2014, they therefore must be dismissed as time-barred.

of Crescendo and alleges, without a scintilla of factual support, that Myriad has "profited from, participated in, and been aware of CRESCENDO's fraud." FAC at ¶ 33. Putting aside the conclusory nature of this allegation, the FCA and CIFPA are fraud statutes and Myriad and Crescendo are separate corporate entities. Liability cannot be imputed to Myriad based solely on a parent-subsidiary relationship. *See, e.g.*, *United States ex rel. Pecanic v. Sumitomo Elec. Interconnect Prods.*, 2013 U.S. Dist. LEXIS 27913, at *7 (S.D. Cal. Feb. 28, 2013) ("Relator's allegations that [one defendant] is a wholly-owned subsidiary and that [the subsidiary defendant] was at all times subject to [the parent company defendant's] control with respect to these products is insufficient to support alternatively treating the two corporate entities as one."). At a minimum, therefore, Myriad should be dismissed from this action.

## V.  CONCLUSION

For the foregoing reasons, Defendants respectfully requests that the Court dismiss the First Amended Complaint with Prejudice.


Dated: April 16, 2020                                   By */s/ Michael J. Licker*
                                                            Michael J. Licker

                                                        **FOLEY HOAG LLP**
                                                        Giselle J. Joffre (*pro hac vice*)
                                                        Michael J. Licker (*pro hac vice*)
                                                        Joanna McDonough (*pro hac vice*)

                                                        **GREENBERG TRAURIG, LLP**
                                                        Carolyn F. McNiven (SBN 163639)
                                                        Jeffrey P. Palmer (SBN 229314)
                                                        Brian Q. Hall (SBN 318209)

                                                        Attorneys for Defendants Crescendo
                                                        Bioscience, Inc., and Myriad Genetics, Inc.

1

## **FILER'S ATTESTATION**

Pursuant to Civil L.R. 5-1(i)(3), I hereby attest that all signatories to this document have concurred in its filing.

Dated:  April 16, 2020                                                By: */s/ Brian Q. Hall*
                                                                                               Brian Q. Hall

1

## CERTIFICATE OF SERVICE

I hereby certify that on April 16, 2020, pursuant to Local Rule 5-1 and Federal Rule of Civil Procedure 5(b), that the foregoing document was filed electronically with the Clerk of the Court using the CM/ECF and served upon counsel of record.

Dated:  April 16, 2020                                    By: */s/ Brian Q. Hall*
                                                                        Brian Q. Hall

Case No. 3:16-cv-02043-TSH                                    Defendants' Motion to Dismiss