NIALL P. McCARTHY (SBN 160175)
nmccarthy@cpmlegal.com
JUSTIN T. BERGER (SBN 250346)
jberger@cpmlegal.com
BETHANY HILL (SBN 326358)
bhill@cpmlegal.com
**COTCHETT, PITRE & McCARTHY, LLP**
San Francisco Airport Office Center
840 Malcolm Road
Burlingame, CA 94010
Telephone: (650) 697-6000
Facsimile: (650) 697-0577

*Attorneys for Relator STF, LLC*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| UNITED STATES OF AMERICA; STATE OF CALIFORNIA; *ex rel.* STF, LLC, an organization,<br><br>Plaintiffs,<br><br>v.<br><br>CRESCENDO BIOSCIENCE, INC., a Delaware corporation; and MYRIAD GENETICS, INC., a Delaware corporation,<br><br>Defendants. | CASE NO. 3:16-cv-02043-TSH<br><br>**RELATOR STF, LLC'S RESPONSE TO POSITION OF DEFENDANTS CRESCENDO BIOSCIENCE, INC. AND MYRIAD GENETICS, INC. PURSUANT TO MAGISTRATE JUDGE THOMAS S. HIXON'S ORDER ON MARCH 22, 2021 AND LOCAL RULE 37-3** |

## I. THE PRIVILEGE LOGS

### A. STF will produce documents related to the drafting of the STF Operating Agreement.

The bulk of the privilege log dispute is now moot, as Relator will be producing drafts of the STF Operating Agreement prepared by Mr. Riedel's and Dr. Gersh's attorneys, and surrounding correspondence. Though the documents are arguably work-product and/or protected by attorney-client privilege, after further review, the attorneys' changes to the drafts are largely non-substantive or ministerial in nature. The documents will be produced this week.

To be clear, STF produced the final version of the Operating Agreement to Crescendo as part of its August 27, 2020 production under Bates No. STFC00288. Accordingly, Crescendo was free to explore the substance and creation of the STF Operating Agreement with Mr. Riedel and Dr. Gersh in their respective February and March 2021 depositions.

### B. Six documents will remain at issue from the March 16 privilege log after production of the STF Operating Agreement drafts.

Crescendo's separate statement requests production of 36 entries from the March 16 privilege log. After production of the Operating Agreement drafts and related correspondence, only 6 of those documents will remain on the privilege log. Five of those documents are communications directly between Chris Riedel and Dr. Gersh that reflect the substance of communications with litigation counsel, or were otherwise made in anticipation of litigation and trial (the sixth document will be produced, but partially redacted on the same grounds). Accordingly, they are protected from disclosure. *See, e.g., In re Grand Jury Subpoena*, 357 F.3d 900, 906 (9th Cir. 2004) (Federal Rule of Civil Procedure 26(b)(3) protects "from discovery documents and tangible things prepared by a party or his representative in anticipation of litigation."); *Goff v. Harrah's Operating Co.*, 240 F.R.D. 659, 660 (D. Nev. 2007) (documents prepared by a party relating to "shopping" for an attorney were work product); *In re LDK Solar Sec. Litig.*, No. C07-5182 WHA (BZ), 2010 WL 114009, at *1 (N.D. Cal. Jan. 7, 2010) (discussions among party representatives reflected in the notes would not have occurred but for impending litigation, and therefore qualified as work product despite no involvement of attorneys in the discussions).

### C. Documents redacted for attorney-client privilege.

Defendants also request that Relator be ordered to produce all documents on its privilege logs that have been redacted on the basis of attorney/client privilege. As an initial matter, Defendants did not adequately meet and confer on this category of documents. Had they done so, Relator would have explained that these are simply e-mails that were forwarded to outside counsel (CPM), and the redactions are of the portions of the e-mails that reflect that forwarding—and any commentary that accompanied it. There has never been any contention that such portions of the communications are not privileged. Relator will not produce these documents.

///

///

///

**RELATOR STF, LLC'S RESPONSE TO POSITION OF DEFENDANTS CRESCENDO BIOSCIENCE, INC. AND MYRIAD GENETICS, INC. PURSUANT TO MAGISTRATE JUDGE THOMAS S. HIXON'S ORDER ON MARCH 22, 2021 AND LOCAL RULE 37-3; Case No. 3:16-cv-02043-TSH**   1

LAW OFFICES
COTCHETT, PITRE &
MCCARTHY, LLP

## II. THERE IS NO APPLICABLE CRIME/FRAUD EXCEPTION TO THE ATTORNEY/CLIENT PRIVILEGE.

Crescendo's "crime/fraud exception" theory is baseless. As Dr. Gersh repeatedly testified, she was propositioned by Crescendo and other laboratories to engage in the fraudulent schemes that are the subject of this and other pending *qui tam* lawsuits, and she entered into agreements with them in order to provide evidence to the government. *See*, *e.g.*, Testimony of Dr. Gersh, attached hereto as **Exhibit A**, at pp. 114:17-22 ("I spoke to [the government agents] about what was happening, and they told me to go ahead and contact some of the companies and to keep them in the loop of what was happening in terms of what I arranged and what was offered to me."); 172:10-19 (The sales representative for one of the companies "made it very clear that it was totally irrelevant what that person did in the office. And it didn't have to be -- it totally did not have to be someone who was actually drawing the blood."); 220:12-21 (Crescendo's representative "immediately offered" her $15 through a middleman for blood draws; "so part of my mission was just, you know, just to see what do they do. I'm not twisting arms, I'm not telling people what to do"). The government agents with whom she had been in contact had correctly advised her that they needed evidence of those schemes in order to investigate. Accordingly, she and Mr. Tygenhof gathered the required evidence, by, among other things, agreeing to enter into the agreements drafted and presented *by the laboratories*.

Fraud requires the counterparty to be deceived; there is no colorable evidence that Dr. Gersh or Mr. Tygenhof misled any of these laboratories. A whistleblower who is propositioned by a defendant to engage in a fraudulent scheme, and agrees to do so in order to provide evidence of the scheme to the government, is not liable for engaging in a crime or a fraud. Crescendo provides no authority to the contrary, and none exists.

Even if Crescendo could articulate a colorable crime or fraud, it would not give rise to the crime/fraud exception to the attorney/client communication privilege, which applies only when said communication is "in furtherance of future illegal conduct." *United States v. Zolin*, 491 U.S. 554, 554 (1989). Additionally, "before a district court may engage in in camera review at the request of the party opposing the privilege, that party must present evidence sufficient to support a reasonable belief that in camera review may yield evidence that establishes the exception's applicability." *Id.* at 554, 574–75. The laboratories at issue approached Dr. Gersh with their fraudulent schemes in late 2015. Dr. Gersh did not retain counsel until March 2016. Accordingly, even if Crescendo could show a fraud, they could not show a communication with counsel in furtherance of it.

Defendants have offered no explanation of how Mr. Tygenhof's or Dr. Gersh's conduct would constitute an illegal fraud. The only way in which Defendants were misled was in believing that Dr. Gersh and Mr. Tygenhof were willing participants in Defendants' fraudulent schemes. That is not fraud, or a crime of any sort. Defendants have failed to meet the standard to secure *in camera* review of privileged documents under the crime/fraud exception.

Dated: March 29, 2021                                **COTCHETT, PITRE & McCARTHY, LLP**

By:   */s/ Bethany M. Hill*
           NIALL P. McCARTHY
           JUSTIN T. BERGER
           BETHANY HILL

*Attorneys for Relator STF, LLC*

**RELATOR STF, LLC'S RESPONSE TO POSITION OF DEFENDANTS CRESCENDO BIOSCIENCE, INC. AND MYRIAD GENETICS, INC. PURSUANT TO MAGISTRATE JUDGE THOMAS S. HIXON'S ORDER ON MARCH 22, 2021 AND LOCAL RULE 37-3; Case No. 3:16-cv-02043-TSH**   2

LAW OFFICES
COTCHETT, PITRE &
McCARTHY, LLP

# EXHIBIT A

```
1     referring to, are those the companies that
2     are on this Schedule A?
3         A    Correct.
4         Q    And after being introduced to these
5     companies by Mr. Carrillo, did you then
6     undertake to learn about the Vectra test?
7         A    Well, that did happen, yes.
8         Q    Why?  Why were -- what was your
9     interest in learning about the Vectra test?
10        A    Well, it was twofold; one, it
11    actually sounded like an interesting test
12    that I would like to learn about, and two, I
13    was working with the state agent, Vlad, and
14    with the FBI agent in charge of medical
15    insurance fraud and medical fraud in Orange
16    County.
17              And I spoke to them about what was
18    happening, and they told me to go ahead and
19    contact some of the companies and to keep
20    them in the loop of what was happening in
21    terms of what I arranged and what was offered
22    to me.
23        Q    Okay.  When you said you were
24    working with a state agent, Vlad, what is his
25    full name?
```

1   labs were aware that he would be paying
2   physicians directly?
3       A   Yes.  It was very clear that --
4   that this was an arrangement that -- that we
5   would draw the blood, the lab would pay him,
6   he would pay me.  And he said, that way,
7   there's never a direct payment from the lab
8   to the physician's practice.
9           But he also told me that it
10  wouldn't be me directly.  It had to be
11  anybody who was employed by my practice, but
12  that person had to have a different last
13  name.
14          So he made it very clear that it
15  was totally irrelevant what that person did
16  in the office.  And it didn't have to be --
17  it totally did not have to be someone who was
18  actually drawing the blood.
19          He said, "The most important thing
20  is that whoever's name is on it is not your
21  name.  It just can't be your name.  It can be
22  a relative.  It could be anybody, but not
23  with your last name."
24          And he made it very clear that the
25  important thing is that there's no direct

1            That my life is complex or what?
2            I don't know what you're asking me.
3        Q   Yes, with respect to the
4    complexities in your life.
5        A   Okay.  So my life is definitely
6    complex, like probably most people's are, and
7    my -- part of my job working with the agent
8    was to see what the companies were doing.
9            And so it was already established
10   that they were willing, just from my
11   conversation with Kerry Jacobson, that, right
12   out the gate, that, yeah, she immediately
13   offered me the $15 and knew, you know, that
14   it had to go through the phlebotomy
15   middleman, you know, a/k/a sort of like money
16   laundering.  I don't know.
17           But anyway, so it went through this
18   sort of middleman thing, and so part of my
19   mission was just, you know, just to see what
20   do they do.  I'm not twisting arms, I'm not
21   telling people what to do.
22           I'm just saying, "Is this part of
23   your program?  Do you also offer an
24   alternative program?"  Not like, "Okay, I
25   know you offer the program through Biotex,"